I will call the case of Fernandez v. Trees, Inc. Mr. Corona. Good morning, Your Honors. Ricardo Corona on behalf of the appellant and plaintiff Alexis Fernandez. Your Honors, I got to preface and apologize in advance for some of the language that I may have to say, some curse words that I would not normally use, specifically not in front of women or in a courtroom. But this is the language that Mr. Fernandez endured and had to deal with, culminating to the point that he wanted to kill himself and douse himself with gasoline at this workplace. So in order for this court to affirm the district court's ruling, the court would have to find that as a matter of law, that word saying, fucking no more Cubans, does not allow Mr. Fernandez to present his claims to a jury. And I believe that had the district court had the benefit of this court's recently published opinion from Smelter, which was issued after our initial brief was filed, that I think that the outcome would have been different. Is there a dispute in the facts about whether those statements were made? I think it was eight or nine times over the over the course of this problematic time versus every day. So there is different testimony and the police position is that this was eight to 11 times and that's their position in their answer brief. And under the Smelter case, that would have been enough combined with his testimony. So when Mr. Mr. Fernandez is being deposed, he's his testimony is that this is something that was happening every day. Fucking Cubans, whining Cubans, lazy Cubans, that this would happen in the meetings. This was these, this company, they do, they cut the trees for the electrical lines, for utility lines. And so they would meet in the mornings with Mr. Soto, who was a supervisor. And at those meetings is when this was, this was done, that this, this, this, these discriminatory statements were made. So there's two employees who also testified that said it happened often. One said it five, Mr. Hernandez or Mr. Perez said this happened five times a day. And he said, oh, when, how often would this happen? Five times. He said more like five times a day. So I think that there is a disputed issue of fact as to how many times it happened. Cause initially Mr. Soto, Mr. Fernandez Soto says it happened every day. And then later on in the deposition when he was asked, he said it wasn't more than 10. And I think that's what the district court held her had on that. He said, God, I don't know, but this is after seven hours of deposition after being asked several questions and in taking into the context, his, his mindset. And in the deposition, wasn't, he asked about specific phrases, how many times he recalled. So in other words, in the deposition, he was asked, no, uh, how many times did, did Adam say, you know, blank Cubans versus blankety blank Cubans. In other words, I'm not sure that that refutes the comment that the comments were made on a daily basis, just because he couldn't remember which particular phrase. Correct. Exactly. And, and, and the fact is that he said that he had heard these comments every day. And you combine that also with the testimony of these two additional employees, which were Perez and Hernandez, who testified both that this happened every day and that the comments were made when people would complain about the tools, because one of Mr. Hernandez's deposition, Mr. Hernandez was being reprimanded for putting a cone on an accelerator. So that the truck could work. These people have to use this bucket truck. And in order for the he had to put the cone on the accelerator so that the engine could be, I guess, would give it more power. And he was reprimanded for that. And what their position was, was that every time they would complain about these inadequate tools, that they were, that, that Mr. Soto's comment would be again, I'm sorry, fucking Cubans, you lazy fucking Cubans, you whining Cubans, you Cuban pieces of shit. So this was, um, stuff that he had to endure on a daily basis. And really with the hostile working claim, we're limited to one factor and that's whether or not objectively under the objective test under Miller and under Mendoza, if we have met those, the frequency, severity, humiliating, and whether it affected his work environment. So under the frequency, I think we've kind of touched on the frequency under the severity, again, the shitty Cubans and the fact that there's testimony that this was told to Mr. Soto, Hey, stop doing this. You know, if you're talking about Cubans plurally, I am Cuban, please don't do this anymore. And the discriminatory comments continued after he was advised of that. So under the Miller, under, under Miller, this court had found that that would be enough to make it severe and humiliating. Is there any evidence in the record that the derogatory comments objectively interfered with Mr. Fernandez's job performance? Well, I don't think there could be any more interference than attempting to douse yourself on fire at the workplace. But that's subjective and that's terrible, but that's how he felt about it. So from the standpoint of a reasonable person, how did it interfere with his job? So you go into even Mr. Soto's deposition testimony. And if you look in the deposition on page 69, sorry, the docket entry 69-1 pages 15 and 16, Mr. Soto himself testifies that Mr. Fernandez was his top three employees. And during the last two months of his employment, this is their position that his, that he became erratic, that he started doing things that were affecting his job, that he was reprimanded. So under their own testimony, it's created an adversity affected his employment. What page did you say that was? That's on docket entry 69-1 pages 15 and 16, where he's talking about how good of an employee Mr. Fernandez was initially, that he was a top three. And then he goes on to say all these things that started affecting his employment during the end of his employment, the last two months specifically, which are specifically the two months that are relevant for this case. Because this was. So are you saying that that shows that a reasonable person would find the comments so disturbing that it would interfere with their job performance? Because what you just said also seems to me to be kind of subjective. I think that it would affect his job performance. And I think that under the Smelter opinion, we can look at the totality of the circumstances and under Smelter, I don't think that that factor was even met. But I think that in our case, we do meet that factor because of the fact that it maybe subjectively affected his employment, but it did affect his employment based on Mr. Soto's own testimony. There were other Cubans on the crew as well, right? Correct. Did it have similar impacts on their work performance? So the only evidence that we have regarding other Cubans and affecting their employment was I guess Juan Carlitos, they called him short Carlitos, who there was a fight that he wanted to break Mr. Soto's head off, a fight that endured. And Mr. Hernandez, Mr. Hernandez said that the inadequate tools affected their work employment. So there's testimony that the inadequate tools that they were provided were only provided to the Cubans. And specifically, the ability to have a truck that could use or lift the bucket truck without having to put a cone in the accelerator, I think that's objectively giving somebody, and in our case, Mr. Hernandez is Cuban, that that is objectively. I mean, it's hard to meet that factor under a pure objective component, but you have two other witnesses in that context. Where's the testimony about the defective tools that were only given to the Cubans? There is testimony. In fact, the court, the district court found that at most, that that's the only evidence that we presented to show that factor, that at most we show that the tools were inadequate. I mean, I could look at the record real quick. I could bring it up to the court and rebuttal. If it's in the district court opinion, that's fine. Yeah. She specifically found that under that factor, that the only thing that at best, what we did was show that the Cubans were given inadequate tools. So under the severity, under each of the elements and under the totality of the circumstances, and I see I'm running out of time, but under each of the elements, and again, I think if the court had the benefit of this court's opinion smelter, the result would have been different. So unless there's any other questions, I'll read out my briefs and I respectfully ask the court to reverse the district court opinion. Thank you, Judge. Ms. Lyons? May it please the court. I'm Angelique Lyons and I represent Trees, Inc. in this matter. As a preliminary matter, I think it's important to look at just what is the testimony that's in the record. In Mr. Fernandez's deposition, when asked about the comments that he heard while he was employed at Trees, Inc., he specifically referenced an incident between Short Carlitos and Mr. Adam Soto, in which Mr. Soto made some comments, including allegedly, no more Cubans, shitty Cubans, effing Cubans, and whiny Cubans. Mr. Fernandez then went on to say that he heard these every day. But when asked to clarify what he meant by that, the question that was put to Mr. Fernandez was, how many times did he make these comments about 67 of his deposition? And he said, I didn't count them, but it was several times. The next question, was it every day? The answer, no, like every other day. So at this point, what we know is there was the incident with Short Carlitos and Mr. Soto that Mr. Fernandez observed. Then we know that there were some unspecified comments about Cubans made like every other day. Later in the deposition, this was dug into a little bit further to find out exactly what the extent of the comments were. Mr. Fernandez testified that he heard the comment, fucking Cubans, one time, other than the fight with Short Carlitos, and that he heard the comment, shitty Cubans, an unknown number of times. He was not able to say how often he heard those comments. Well, for summary judgment purposes, is there really such a material difference between every day and every other day? Well, there is if you look at what the comment is. He said that he heard comments about Cubans like every other day. What are those comments? That's a conclusory statement from which he wants the court to assume, one, those comments were negative, two, that those comments were in fact about Cubans, and three, that those comments were just saying, I heard comments about Cubans like every other day is a conclusion. It's a conclusion. Many gave examples of those comments like shitty Cubans, effing Cubans, etc. And I'm just wondering, is it really reasonable to ask somebody to remember whether somebody said effing Cubans or shitty Cubans on which day or on how many days? No, Your Honor. At least for purposes of summary judgment. I mean, he could be impeached with that trial. I agree, Your Honor. It's not reasonable, and we're not suggesting that a plaintiff in a harassment claim bring with them a diary listing every single time they heard every single comment. What we are suggesting, however, is that a vague conclusory statement such as, I heard comments about Cubans every other day, is not sufficient when the only two comments— But when he gave three or four examples, why isn't it a reasonable inference that the other Well, there's no record evidence to support that inference, so that goes beyond a reasonable inference. If he said, I heard comments— Wouldn't it be unreasonable, given what we've heard, to assume that some of the comments were, gosh, Cubans are great. I love Cubans, right? Wouldn't that—if that were the type of comment that had come out, wouldn't testimony to that effect have occurred? Well, actually, Mr. Fernandez did testify that him and Mr. Soto were friends, and when he first heard those comments, he thought Mr. Soto was joking. So I don't know that it would be a stretch of the imagination, Your Honor, to claim that the other comments were not similar. However, it's not just that the comments were negative, and looking at the totality of the circumstances and all four of the Mendoza factors, the comments also have to be severe, and they have to be physically threatening or humiliating. So before you can make those determinations, you have to know what the comments are, and there's a big difference between someone saying, for example, you're lazy versus you effing Cuban. There's a difference, and so in order to make the analysis and reach a reasonable inference that the comments were negative, that they were severe, that they were physically threatening or humiliating, you have to have some idea what the comments are. I agree with you that there may be a question of whether the severity rises to the level to create a hostile work environment, but for purposes of frequency of the comments, isn't there enough here for summary judgment? Don't you have to concede that? I don't concede that, Your Honor, because of the nature of what his testimony was. The other two employees whom Mr. Fernandez is relying heavily on and trying to show the frequency of the comments, those two employees testified about what they heard. Mr. Fernandez testified about what he heard, and he listed two comments. I understand your argument about that. Let me redirect you just a little bit. In our Reeves case, the en banc court held that derogatory comments made on a daily basis about women, where she complained and the manager tolerated that conduct, supported a hostile work environment. How is this case different from Reeves? Well, it's different in that the did not decide the issue of whether a general conclusory statement that an employee was subject to racial comments, or in that case sexual comments, like every other day, is sufficient when the only two examples that the plaintiff can give don't rise to the level of frequency because they only happened a very limited number of times. So it would be different if Mr. Fernandez had or if he had testified, I heard the effing Cuban comment every single day or every other day, but that's not what he said. He identified two comments he heard. One, the effing Cuban comment, which he heard on the day of the short Carlitos fight, and then again one other time, and this shitty Cuban comment that he doesn't know how often he heard it, but there was some testimony that it was 10 or 20 times. If we were presented with the case where he said he heard either of those comments every day or every other day, that would be different. Or if he had said, I heard 15 to 20 different comments, I just don't remember how frequently I heard them, that would be different. But all we have here is I heard comments about Cubans like every other day, and that's very different than a situation where there's more specific evidence as to what those comments are or what the frequency of a specific comment is. But you're right, Your Honor, that it's not just a matter of frequency. In looking at the case, we also need to look at the other four factors, or I'm sorry, the other three factors from Mendoza, and the second factor that's typically looked at is the severity of the comments. In this case, the severity of the comments does not rise to the level necessary to establish a hostile work environment. The comments, well at least the two that we know about anyways, were effing Cuban and shitty Cuban. These comments were not directed towards Mr. Fernandez. He said in his deposition that these were spoken at a general meeting and were not directed to him. Do we know how many people were at that meeting? All of the crews that were working, so there's a supervisor, then there's general foremans, and then there's two men crews. So there's some testimony it was more than eight people, but I don't know the exact number on any given day. Let's say eight to ten people to make the meeting large, three of whom were Cuban, we think? No, there were more Cuban employees. There's testimony in the record as to all of the Cuban employees, and it was more than three. I would, I am certain there is testimony in the record as to a more accurate conclusion as to the number of individuals present at those meetings. It would be more than eight. It would probably be more than like 20 or 25. Okay, and the complaints were made to whom? Like the complaints about this, about these comments were raised with management, right? Um, Mr. Fernandez said he asked Mr. Soto not to make comments because he was Cuban, and then he claims he called an HR person. Okay, yes, that's as far as it went? Yes. And you do not, however, you do not argue in your brief as I read it that if these comments are sufficiently frequent and sufficiently severe and so forth so that they you do not argue that the company is nevertheless not liable because there was no constructive knowledge or whatever the other test. You do not make that argument about no company liability. We do not, Your Honor, because taking the light of the evidence most favorable to Mr. Fernandez, he said he complained and that nothing happened. So we did not put that as an argument because, not that we agree that he complained, but of course taking the evidence in the light that's favorable to him, we felt that would be taking the court somewhere we didn't need to go. When you look at that fourth element of whether the conduct was sufficiently severe or pervasive to alter the terms and conditions of his work environment, the conduct, as I said, was not made directly toward Mr. Fernandez, was made in a group setting, did not include. But Mr. Fernandez, the plaintiff, did personally tell Soto, Adam Soto, that you shouldn't say that kind of thing because I am a Cuban and I'm a hundred percent Cuban so you're saying it to me. After that, it seems to me they were directed to this plaintiff. Well, I think this is a different situation than we find in other cases where the court has held that the comments were made directly to the plaintiff. These were made in a group setting. And there's several cases that say when a colloquy like what I just described happened, then it is considered directed at this plaintiff. Is that not correct? I believe that the cases talk about if you complain and the comments continue, but it doesn't say comments made to a general audience are directly made to a specific plaintiff, Your Honor. I'm unaware of any cases that say that, because in this matter, the several comments that the plaintiff was able to testify to were made to the group as a whole. In addition, in an unpublished opinion, the 11th Circuit has previously held that the comment, fucking Cubans, is not severe. In that case is Dominguez versus Lake Como Club. In that case, the court held that comments such as fucking Cubans, and we don't have any Mexicans working here, but we got the next best thing, a Cuban, and I hate fucking Cubans, were not sufficiently severe or pervasive. It takes direct racial, one of the factors to look at in determining if something is severe is if it's a direct racial slur or if it's made to a and shitty Cuban were not physically threatening or humiliating. This court in Adams versus Austell in 2014 said in determining this element that there is a difference between employees who merely overhear a racial slur and employees to whom it is directed, and that is the case here. There is a difference. On the Reeves case, there were no comments directed to the plaintiff, isn't that right? In the Reeves case? Reeves en banc case. The court said that a couple of times, I believe. Right, there were comments such as, well, very graphic sexual comments that were not permeated the workplace. They were not directed to her. That is correct, but the nature of the comments is significantly different than the nature of the comments were, pardon me, whore, bitch, cunt. There were comments about women's breasts and nipples, and there were pornographic images in the workplace. That's certainly a different level of severity than we have here, where Mr. Fernandez claims he heard comments about Cubans like every other day. There's also no evidence that this interfered, objectively interfered with his work performance. I believe this was discussed briefly while Mr. Fernandez's case was being presented. There's no, actually Mr. Fernandez himself denied that he ever engaged in any behavior that was violation of any policies or practices or procedures at the workplace, and when asked about specific instances where someone thought he had at work engaged in such conduct, Mr. Fernandez testified he didn't. Mr. Fernandez's testimony was that he never had any performance deficiencies during his employment with Trees, Inc. Mr. Fernandez's attorney spoke frequently about the recent case of Smelter. I believe, Judge Pryor, you wrote that opinion, and I think this case is distinguishable from that recent case for several reasons. One, in the Smelter case, there were eight specific comments that the plaintiff was able to identify, and in discussing whether the frequency and severity factors were met, the court specifically said if we look at just those eight, then it is in fact met, and the court didn't consider at that point of the analysis whether or not a more general comment that I was subject to racial comments on a daily basis was sufficient. And there are similar cases in unpublished opinions by this court, such as the Godoy case, where the 11th Circuit has, where a panel of the 11th Circuit held that general allegations, such as a racial slurs being said every, almost every shift, are not severe or pervasive because the plaintiff failed to carry his burden of presenting evidence showing it was severe or pervasive. He presented evidence of isolated incidences of harassment and did not present evidence indicating the frequency or pervasiveness of the derogatory comments he alleges. That's the same situation we have in that case. It's, I think it's Godoy, Godoy, G-O-D-O-Y versus Habersham County. It's an 11th Circuit 2006 unpublished opinion, and that is very eerily similar to our case where the plaintiff made a general allegation of racial slurs almost every shift, but was only able to identify four or five specific comments. And the court said, based upon that general, the court didn't say it as in depth as I'm saying it, but essentially said that the general comments don't provide enough evidence to show frequency and pervasiveness. So we can only look at the specific comments. But let me ask you, and let me be clear, I'm not asking you to say what these comments would be, so do not, do not mistake that. But are there comments in your view that could be made about Cubans that would be as offensive as some of the comments that you shared from the other case, or as some of the, some of the other comments that we've heard that have been deemed sufficiently severe? I think there are, Your Honor. I think there are cases where there are racial or, I guess, ethnic slurs that, I don't know how to, but I think there's certainly comments or names used to describe individuals of Cuban or Hispanic origin that are much more offensive than the severity of the comments were elevated, you would think that this was a different case for your client? Well, certainly if the severity were elevated, this would be a different case, because you do consider all four factors and the totality of the circumstances, and the circumstances here are much different than in many of the cases that Mr. Fernandez relies on. In his brief, Mr. Fernandez was employed there for 14 months. He testifies he was friends with the individual who made these comments, and that sets a very different environment when looking at the totality of the circumstances. There are no further questions. Thank you. And I'll just briefly talk on Godoy. Godoy, what actually happened, and if you look at the actual district, district court summary judgment ruling, there was no evidence. It was just testimony from the attorney, and that's footnote 10 in the Godoy summary judgment ruling, so there was actually no evidence, which is the evidence we have in this case. With regard to the complaints, as Judge Grant asked, there was complaints that happened daily, not only from Mr. Fernandez, but from Mr. Fernandez's wife, Mr. Fernandez's son, and Mr. Hernandez, and there was another individual, Araceli, I can't recall his name at this moment, also were complaining to the HR department. The HR department complaint would go to an individual by the name of Gustavo Gamez, his wife, who happens to be Mr. Soto's uncle, so the HR department would go to there, so there was complaints, and the record for those is under Fernandez's deposition, 57-1, 70 to 73, and in 57-3, for the deposition of Hernandez, he testified the individual's name was Alma Carr, and and so there was, there was definitely several complaints, and with regard to the severity analysis under Mitter, this court has ruled that if you advise a supervisor to stop making those comments, and those comments continue, that that could rise to this, that that would go above and to be severe. What case is that from? The Mitter, Mitter, Mitter versus Thorne. Do you have the site? Yes, one, one second, it's actually cited in. If it's in your brief, then I'll. It's in the brief, and it's in Judge, in Judge Pryor's Smelter opinion, so I submitted a lot of cases tied to the Mitter case. The Mitter case is basically laid out the four, well, analyzes the four factors from the objective. Is what you're saying that if the comments, the comments are offensive, and you go and say, hey, these comments are offensive to me, you need to make them stop, and the company does not make the comments stop, that that automatically establishes severity? I don't think it automatically establishes severity, and I don't think anything is automatic with regard to this, these factors. I think it's, you, it just, it's just another factor to consider in the totality of the circumstances, so taking that into consideration in the totality of the circumstances that he had complained, and, and he tells them, and just like Judge Anderson said, he said, stop, because you're talking about Cubans plurally. I'm a Cuban, and it's affecting me, and when this continues to go on, and go on, and go on, until the point that he, you know, reaches his, his, his breaking point, and with regard to the Cubans that were working there, there was, I think, testimony, there was six, they, they made these individuals sign a paper two or three days after this incident occurred. Mr. Hernandez also initialed that document saying there was no discrimination. He says that he just put a circle or a scribble because he didn't really believe that there was no discrimination, but that he was scared for his job if they were going to allege it was discrimination, and that scared for your job also goes into severity and humiliating because of the if you don't like it, you can go, and the door is open for you guys to leave, telling them to basically leave, and, and for the door open, that was in Carlos's depot at page 33, Perez's depot is 57-2, and under, under Holsey, the, this court found that when it's done by a supervisor, for the humiliating context too, if the supervisor is making these comments, that, that would also be humiliating, and as your honor was asking how many people were there when these comments were made, there's a big group, so you take the, the totality of circumstances under humiliating, it, it exacerbates the, the, the, the discriminatory conduct. Do we have any testimony regarding the reaction of the others in the group? You have testimony regarding Mr. Perez, who said that he wouldn't like it, there was testimony from Mr. Hernandez saying that he would, he was offended by it, in Mr. Hernandez's depot, I could tell you the actual site if you give me one second. There was some point that he, that Mr., Mr. Hernandez said in his deposition that if he said it directly to my face, that I would break his face, that he would say it, that the context of the complaints was that you would complain about a tool, and he's a effing Cubans, or you lazy Cubans, always whining, and that he would say if he would actually have said it to my face, that he would break his face, that was what Hernandez's, his testimony was. Do we know what the reaction of the non-Cubans in the group was? We, there's no, there's nothing in the record with regard to the non-Cubans in the group, but what, so I, with, my time is up, judges, I thank you all, I really appreciate the time and the opportunity to be here, and we respectfully ask the court to reverse, and have this matter tried on the merits. Thank you.